**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

IRFAN MAHMOOD, an individual,
and AMNA MAHMOOD, an individual,

      Plaintiffs,                     CASE NO. 2:09
                                            HON.
V.                                   MAGISTRATE:

U.S. MEDICAL MANAGEMENT, LLC,
a Delaware limited liability company,
VPA, P.C., a Michigan professional
service corporation, FAMILY NURSE
CARE, LLC, a Michigan limited liability company,
PHOENIX HOME HEALTH CARE, LLC,
a Delaware limited liability company, and
MARK MITCHELL, an individual,                  **Demand for Jury Trial**
jointly and severally,

      Defendants.
_____/

**Mantese Honigman Rossman**
**and Williamson, P.C.**
GERARD MANTESE (P34424)
gmantese@manteselaw.com
IAN M. WILLIAMSON (P65056)
iwilliamson@manteselaw.com
Attorneys for Plaintiffs
1361 E. Big Beaver Road
Troy, MI 48083
(248) 457-9200 (telephone)
(248) 457-9201 (facsimile)

_____/

## <u>PLAINTIFFS' COMPLAINT</u>

      Plaintiffs, by their attorneys, Mantese Honigman Rossman and Williamson, P.C.,

and for their Complaint against Defendants, state as follows:

## BACKGROUND OF THE CASE

1.      This is a civil action brought by Plaintiffs under Title IX of the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations Act ("RICO" or "the Act"), 18 U.S.C. § 1961 *et. seq.*, and also for common law fraud and silent fraud, constructive fraud, innocent misrepresentation, conspiracy, and other unlawful conduct.

2.      This case is about how the Plaintiffs, having met Mark Mitchell, were fraudulently induced to sell Phoenix Home Health Care, LLC[1], for an agreed price that has not been paid in full, and whose purchase was an integral part of a scheme orchestrated by Defendants to defraud the government and other third-party payers of substantial sums of money.

3.      Defendants' acquisition of Phoenix Home Health Care, LLC, was in direct violation of 18 U.S.C. § 1962(a), which provides as follows:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity…to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce…

4.      Specifically, Defendants conspired to acquire, Defendant Mark Mitchell indirectly acquired, through non-party Home Health Ventures, LLC, an interest in Phoenix Home Health Care, LLC an enterprise which is engaged in, or the activities of

---

[1]   In May of 2009, Phoenix Home Health Care, Inc. was merged into a Delaware company, now named Phoenix Home Health Care, LLC, which is named as a co-defendant.  Plaintiffs will be referring to this entity in its current form as an LLC throughout this Complaint.

which affect, interstate commerce, through the use of income derived directly or indirectly from a pattern of racketeering activity.

5.      For years prior to the acquisition of Phoenix Home Health Care, LLC, Defendant Mark Mitchell and the entity Defendants engaged in pattern of corruption in which they fraudulently received substantial sums of money for health care services through illegal kickbacks and submissions of false claims.  Defendants' acquisition of Phoenix Home Health Care, LLC was an attempt to avoid further government investigation into the activities of Family Nurse Care, LLC, a home health agency owned and controlled by Defendant Mitchell, which was a participant in an overarching scheme involving all Defendants to defraud state and federal governments through the submission of false claims for reimbursement for unnecessary and inappropriate care and services provided to Medicare and Medicaid recipients.

6.      Besides being illegal on its face under 18 U.S.C. § 1962(a), Defendants' acquisition of Phoenix Home Health Care, LLC was itself procured through fraudulent representations and omissions directed at Plaintiffs.  Moreover, once Phoenix Home Health Care, LLC was entirely under Defendants' control, Defendants barred Plaintiffs from the premises and refused to pay funds due to Plaintiffs for the purchase of Phoenix Home Health Care, LLC and for Phoenix Home Health Care, LLC's employment of Plaintiff Irfan Mahmood.

7.      It was only after closing that it became apparent that Phoenix Home Health Care, LLC was purchased as part of a scheme to subvert further government inquiries of Defendants.  The scheme involved, *inter alia*, having patients transferred from Family Nurse Care, LLC to Phoenix Home Health Care, LLC so that the patient

census at Family Nurse Care, LLC would drop and thus not generate as much revenues to Family Nurse Care, LLC, and patients whose ongoing care had been questioned could be discharged and "re-opened" at Phoenix Home Health Care, LLC.  The related revenues that had formerly accrued to Family Nurse Care, LLC could then be diverted to Phoenix Home Health Care, LLC, creating the false impression that regulatory noncompliance and potential health care fraud at Family Nurse Care, LLC had been corrected when, in reality, Family Nurse Care, LLC did not comply with the government's request for corrective actions.

8.     Within the months after closing, it also became apparent that Defendants intended to use Phoenix Home Health Care, LLC to supplement and increase their scheme to fraudulently obtain reimbursement for unnecessary medical testing and services provided to Medicare and Medicaid enrollees.  Because Irfan challenged Defendants' efforts to draw Phoenix Home Health Care, LLC into their fraudulent scheme, Defendants retaliated against Plaintiffs, proximately causing them to sustain injuries in their business and property.

9.     Defendants have thus perpetrated this unlawful conduct through an establishment of a series of criminal enterprises as more fully discussed below, which constitute a pattern of racketeering activities in violation of 18 U.S.C. 1961, *et. seq.*

## JURISDICTIONAL ALLEGATIONS

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the claims brought under the RICO statute invoke a federal question.

4

11.     Venue is properly established in this Court, pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in the Eastern District of Michigan.

12.     This Court may also retain Plaintiffs' State law claims pursuant to its discretion to exercise pendent jurisdiction over those claims.   Pendent jurisdiction is appropriate here because Plaintiff's RICO claim and their non-federal claims derive from a common nucleus of operative facts, and the nature of the non-federal claims are such that trying all of the claims together in one proceeding would achieve judicial economy.

## PARTIES

**A.     Plaintiffs**

13.     Irfan and Amna Mahmood.   Amna owned and Irfan operated Phoenix Home Health Care, Inc. ("Phoenix") which was formed in 2003, as a Michigan corporation to provide home health services.   Prior to Phoenix's sale to Home Health Ventures, LLC in 2007, Amna was its sole shareholder, while Irfan was the Administrator of Phoenix.

**B.     Defendant Mark Mitchell**

14.     Defendant Mark Mitchell ("Mitchell") is a Michigan resident, who resides in this District.

15.     Mitchell is a RICO "person" as defined by 18 U.S.C. § 1961(3).

16.     Mitchell is distinct from the RICO Enterprise defined herein, and he participates in and directs the affairs of the RICO Enterprise defined herein.

17.     Mitchell directly or indirectly owns and/or controls all of the entity Defendants named herein with the exception of VPA, P.C.

5

18.     Mitchell and the entity Defendants, together and in various combinations, have formed an enterprise ("RICO Enterprise") through which Defendants have engaged in a pattern of racketeering activity, proximately causing damages to Plaintiffs.

19.     In the hierarchy of the RICO Enterprise discussed herein, Mitchell ranks at the top, as he has at all times controlled, and controls at the present time, the purposes and operations of the RICO Enterprise through a pattern of criminally unlawful racketeering activity.

## C.     Defendant U.S. Medical Management, LLC

20.     In May 2009, U.S. Medical Management, Inc., a Michigan corporation, was merged into a Delaware company now named Defendant U.S. Medical Management, LLC ("USMM").  USMM was formed by Mitchell as a health care delivery system and is controlled by Mitchell.

21.     USMM is a "person" as defined by 18 U.S.C. § 1961(3).

22.     USMM is distinct from the RICO Enterprise defined herein, and it participates in the affairs of that RICO Enterprise.

23.     USMM is owned and controlled by Mitchell.

## D.     Defendant VPA, P.C.

24.     Defendant VPA, P.C. is a Michigan professional services corporation that, like USMM, was formed in 1994.  VPA, P.C. was created by and is believed to be owned by Dr. Erlinda Del Pilar.  VPA, P.C. provides professional health care services for the health care delivery system managed by USMM.

25.     VPA, P.C. is a "person" as defined by 18 U.S.C. § 1961(3).

26.     VPA, P.C. is distinct from the RICO Enterprise defined herein, and it participates in the affairs of that RICO Enterprise.

**E.     Defendant Family Nurse Care, LLC**

27.     Defendant Family Nurse Care, LLC is a Michigan limited liability company that was formed in 2005, initially under the name "FNC Acquisition, L.L.C.", for the purpose of participating in a merger with Family Nurse Care, Inc., a Michigan corporation that was owned and/or controlled by Mitchell.  The surviving entity was the limited liability company, which was renamed "Family Nurse Care, LLC" ("Family Nurse Care").

28.     Upon information and belief, at all times relevant to this Complaint, Family Nurse Care has been in the business of providing home health care services.

29.     Family Nurse Care uses or has used a number of fictitious names for business purposes, including "Family Home Health Care," "Family Nurse Care," and "Pinnacle Senior Care."  The company currently conducts business under the name "Pinnacle Senior Care."

30.     Family Nurse Care is believed to be wholly owned by Mitchell, and to be under Mitchell's control.

31.     Family Nurse Care provides services in connection with USMM and VPA, P.C., and displays on the Pinnacle Senior Care web page a direct internet link to the Visiting Physicians Association[2] website that includes its various service locations.

32.     Family Nurse Care is a "person" as defined by 18 U.S.C. § 1961(3).

---

2 Both USMM and VPA have registered, and operated under, the assumed name of Visiting Physicians Association.

33.    Family Nurse Care is distinct from the RICO Enterprise defined herein, and it participates in the affairs of that RICO Enterprise.

**F.    Integral Non-Party and RICO Enterprise
Participant Home Health Ventures, LLC**

34.    Home Health Ventures, LLC ("Home Health Ventures") is a Michigan limited liability company that was created for the sole purpose of functioning as a vehicle to accept the shares of Phoenix, which Defendants illegally acquired in order to further their racketeering activity.

35.    Upon information and belief, Home Health Ventures has no bank accounts or assets separate from the general commingled assets belonging to entities owned directly or indirectly by Mitchell, and has never had any separate assets aside from the shareholding interest in Phoenix.

36.    Home Health Ventures has at all times been completely dominated by Mitchell, and Home Health Ventures was created for the sole purpose of acquiring Phoenix's provider number in order to conceal and further Defendants' scheme to defraud state and federal governments.

37.    At all times, there has been such a unity of interest and ownership that Home Health Ventures has never truly been an independent entity.

38.    Mitchell has intentionally kept Home Health Ventures undercapitalized such that it has never been anything but an asset-less shell.

39.    Home Health Ventures is a "person" as defined by 18 U.S.C. § 1961(3).

40.    Home Health Ventures is distinct from the RICO Enterprise defined herein, and it participates in the affairs of that RICO Enterprise.

**G.**   **Defendant Phoenix Home Health Care, LLC**

41.    In 2009, Phoenix Home Health Care, Inc., a Michigan corporation was merged into a Delaware corporation also named Phoenix Home Health Care, Inc., with the Delaware corporation as the surviving entity.   Shortly thereafter, Phoenix Home Health Care, Inc. was converted from a Delaware corporation into a Delaware limited liability company named "Phoenix Home Health Care, LLC."

42.    Phoenix is a "person" as defined by 18 U.S.C. § 1961(3).

43.    Phoenix is distinct from the RICO Enterprise defined herein, and it participates in the affairs of that RICO Enterprise.

## THE RICO ENTERPRISE

44.    Mitchell and the entity Defendants have combined through an association in fact and formed a RICO Enterprise as defined by 18 U.S.C. § 1961(4), which is controlled and directed by Mitchell.

45.    The RICO Enterprise consist of five separate entities and one individual, who have, together and in various combinations, conspired to and/or did perpetrate multiple violations of RICO; engage in fraud of various kinds (*inter alia* active fraud, mail and wire fraud, constructive fraud, and fraudulent concealment of material facts); and aid and abet various manners of unlawful conduct on the part of Defendant Mitchell, Home Health Ventures and Defendant Phoenix.

46.    The Enterprise began as early as 1997 and is believed to have continued without interruption since that time.   Based upon the Defendants' affirmative misrepresentations and concealment, Plaintiffs did not discover and could not have reasonably discovered the existence of the RICO Enterprise and the resulting damages

9

that are attributable to its pattern of racketeering activity until shortly before this Complaint was filed.

47.     Pursuant to a pattern of racketeering activity in which its participants have engaged, which exists separate and apart from the RICO Enterprise, Defendants have conspired to and have in fact infiltrated the legitimate business of home health care in order to engage in widespread criminal activity with the ultimate purpose of defrauding both the United States government and various state governments.

48.     Mitchell and the entity Defendants, all of which are associated with the RICO Enterprise, have conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through such pattern of racketeering activity.

49.     The legitimate goals and purposes of the RICO Enterprise are to provide certain medical and home care services to a variety of patients, including large numbers of Medicaid and Medicare enrollees, which RICO Enterprise goals and purposes are separate and distinct from the predicate RICO acts as discussed herein.

50.     However, based on the personal knowledge of Plaintiffs, upon information and belief, and from a series of lawsuits filed in the Federal Court, Eastern District of Michigan (*U.S. ex rel. Kim Marlowe v. Family Nurse Care, et al.*, Case 2:05CV73823; *U.S. ex rel. Richard Chesbrough v. VPA, P.C.*, Case 2:06-cv-15630; and *U.S. ex rel Wally S. Mahar v. Visiting Physicians Association*, Case 03-73158)[3] hereinafter referred to as "Qui Tams", it has become apparent that Defendants have participated in a wide-reaching fraudulent scheme to obtain substantial sums of money from state and federal

---

[3]  These lawsuits were filed between 2003 and 2005 and were unsealed in 2009, with the federal government intervening, in part, as to some parties based upon its findings as to illegal conduct.

governments through illegal kickbacks and submissions of false claims for health care services, particularly home health care services, to third-party payers including the United States government and various state governments.

51.     Upon information and belief, in furtherance of that scheme, Defendants employed tactics including, *inter alia*, misleading solicitation of Medicaid and Medicare enrollees; improper identification of Medicaid and Medicare enrollees as "homebound;" provision of unnecessary and repetitive testing and treatments to Medicaid and Medicare enrollees; illegally acquiring control of additional home health agencies such as Phoenix that engage in or affect interstate commerce; and shuffling Medicaid and Medicare enrollees between different home health care agencies, such as Co-Defendants Family Nurse Care and Phoenix.

52.     In the course of Defendants' scheme to defraud state and federal governments, during Defendants' acquisition of Phoenix, and during the course of Defendants' operation of Phoenix, Defendants conspired to commit and did commit multiple instances of mail fraud as described in 18 U.S.C. § 1341 and wire fraud as described in 18 U.S.C. § 1343.

53.     As a proximate result of Defendants' pattern of racketeering activity in relation to these fraudulent and otherwise unlawful schemes, Plaintiffs sustained substantial damages.

11

**A.    Defendants Mitchell, USMM, and VPA, P.C. Form The Backbone Of The RICO Enterprise In Which Defendants Participate**

54.    Mitchell, who is not a physician, initially formed and owns USMM, d/b/a/ Visiting Physicians Association to provide the management services for the professional services provided through VPA, P.C., a Michigan professional service corporation.

55.    VPA, P.C. is believed to be owned by Dr. Erlinda Del Pilar, and is believed to be controlled at least in part by Mitchell.  VPA, P.C. provides health care services to frail and elderly patients in their homes.[4]

56.    As noted previously, VPA, P.C. and USMM have both operated under the assumed name of Visiting Physicians Association.

57.    VPA, P.C. and USMM promote themselves jointly as Visiting Physicians Association to the public as a home health care delivery system for physician on-call services.

58.    Upon information and belief, and based upon Plaintiffs' personal knowledge and certain allegations in the Qui Tams, the physicians employed by or working on behalf of Visiting Physicians Association, under the control of Mitchell, are responsible for improperly certifying and re-certifying patients for home health services; carrying out improper and unnecessary diagnostic testing and treatments; and prescribing improper and unnecessary home health care to be carried out through

---

4  In order to qualify for home visits from health care providers under Medicare regulations, physicians must certify the patient need for home health care, and the patients must meet various Medicare criteria, including for example:  (A) be "homebound," i.e., require the assistance of another person or must use a supportive device or have medical contraindications to leaving home and have only infrequent and brief absences from home which must be solely for medical care; and (B) require intermittent or part time skilled nursing services or physical, speech, or occupational therapy.  Patients receiving home visits must be re-certified by a physician every 62 days, pursuant to which a signing physician must verify that the patient is homebound, needs a qualified skilled service, is under the signing physician's care, and the signing physician has reviewed and approved a plan for care of the patient.

affiliated home health agencies such as Co-Defendants Family Nurse Care and Phoenix.

**B.     Defendants Acquired Control Of Phoenix As Part Of Their Racketeering Scheme**

59.     Upon further information and belief, in furtherance of their racketeering scheme, Defendants fraudulently induced and engineered the acquisition of Phoenix by Home Health Ventures, a shell company with no assets or bank accounts, so that Defendants could use Phoenix to conceal and to further their scheme to defraud state and federal governments.

60.     In the process, Defendants directly targeted and defrauded Plaintiffs Irfan and Amna Mahmood, who had successfully and profitably operated Phoenix for years in compliance with applicable state and federal regulations.

61.     During the discussions leading up to the transfer of Phoenix ownership, Defendants and their agents made material misrepresentations to Plaintiffs about, *inter alia*, the manner in which Phoenix would be operated; the relationships between several of the entity Defendants; and the level of government scrutiny at Family Nurse Care.  In addition, Defendants failed to disclose and actively concealed material information such as, *inter alia*, Defendants' racketeering RICO Enterprise and their participation in a longstanding and widespread scheme to defraud the U.S. government and several state governments.

62.     As part of their acquisition of Phoenix, Defendants induced Irfan to enter into an employment agreement with Phoenix.  However, after Irfan raised concerns about the legality of Defendants' activities, Defendants constructively discharged Irfan

by locking him out of his office and preventing him from doing his job as Administrator of Phoenix.

63.     Further, once Phoenix was fully integrated into their RICO Enterprise, Defendants refused to pay the remaining balance of the purchase price for Phoenix, thereby preventing Plaintiffs from realizing the full agreed-upon sale price for Phoenix.[5]

64.     During Irfan's short tenure as Administrator of Phoenix after Defendants' acquisition of Phoenix, the company continued to be profitable.[6]  However, as a result of Defendants' use of Phoenix's name and provider number in their scheme to defraud state and federal governments, and of Defendants' mismanagement, Phoenix has now lost much of its value.

65.     Due to Defendants' unlawful conduct, Plaintiffs have lost their profitable home health care business; lost their primary means of income and support; and have been denied the benefit of their bargains with Defendants.

### DEFENDANT USMM'S FRAUDULENT ACTIVITY
### AS DESCRIBED IN THE MAHAR QUI TAM COMPLAINT

66.     The Qui Tam action filed by relator Wally S. Mahar, M.D., describes a pattern of fraudulent conduct by USMM d/b/a Visiting Physicians Association, which conduct is believed to have been ongoing at the time Defendants acquired Phoenix from Plaintiffs.

---

5  The payments under the Purchase Agreement for Phoenix did not even come from Home Health Ventures.  Instead, those payments were made by, *inter alia*, Mitchell, USMM, and related non-party U.S. Medical Management Holdings, Inc.

6  Mitchell has admitted that Irfan served as Phoenix's Administrator for less than four months after Defendants' acquisition of Phoenix, after which Mitchell instructed his subordinates to limit Irfan's job description.  Upon information and belief, this action was directly due to Irfan's concerns about possible improper or illegal conduct by Defendants in their operation of Phoenix.

67.    Upon information and belief, physicians employed by USMM provided care for a substantial number of Medicaid and Medicare enrollees that received home health services through Family Nurse Care at the direction of USMM physicians around the time Defendants acquired Phoenix.

68.    According to the Mahar Qui Tam, "Medicare, Medicaid, and other government-funded health plans have strict regulations defining and restricting coverage of physician house calls and diagnostic tests and procedures performed attendant thereto.  In contravention of these clearly defined regulations, the Defendant USMM d/b/a Visiting Physicians Association conspired to provide unnecessary physician house calls (once a month) to VPA patients of and perform medically unnecessary tests and procedures to unlawfully increase, *inter alia*, Medicare and Medicaid revenues."  (**Ex. 1**, *Mahar Qui Tam*, ¶ 3).

69.    Dr. Mahar further alleges that USMM, at the direction of Mark Mitchell, participated in "schemes [including] medically unnecessary visits to p patients who did not qualify for physician home visits, unlawful upcoding of those visits, and the billing of medically unnecessary tests and procedures including blood tests, cardiac ultrasounds, and oxygen saturation.  In addition, Dr. Mahar's VPA driver, a medical assistant who accompanied Dr. Mahar to all visits, routinely drew blood for a battery of medically unnecessary tests."  (**Ex. 1**, ¶ 19).

70.    Indeed, according to Dr. Mahar, he "had conversations with VPA executives, such as VPA President Mark Mitchell…in which VPA executives related to Dr. Mahar VPA's business plan, which essentially was premised on fraudulent business practices."  (**Ex. 1**, ¶ 20).

71.     Dr. Mahar alleges that "VPA executives – including Robert Kaminski and Mark Mitchell – told Dr. Mahar that the fraudulent activities described [in the Mahar Complaint] were common practice, applicable to all patients, necessary to keep the company afloat, and necessary to pay the salaries of the company's employees, including Dr. Mahar."  (**Ex. 1**, ¶ 26).

72.     Mitchell's alleged familiarity with and support of USMM's fraudulent billing practices is relevant to this case, particularly with respect to Mitchell's removal of Irfan from his position as Administrator of Phoenix within three months after Defendants' acquisition of Phoenix.  Upon information and belief, Mitchell's actions were intended to prevent Irfan from discovering a far-reaching scheme to defraud state and federal governments as described in this Complaint, which involved all of the Defendants hereto and which Defendants hoped to conceal through, *inter alia*, their acquisition of Phoenix.

73.     According to Dr. Mahar, during his tenure with USMM d/b/a Visiting Physicians Association, he "complained to numerous VPA executives and employees about VPA's fraudulent practices.  These valid complaints included but were not limited to the disclosure of the following fraudulent practices: ordering medically unnecessary tests; falsifying the amount of time physicians spent treating patients during home visits and otherwise upcoding claims submissions; falsifying the diagnosis of patients to justify billing for services or to upcode the patient visit; and ordering and submitting claims for the use of medical equipment that was not medically necessary."  (**Ex. 1**, ¶ 39).

74.     Near the end of his tenure with USMM d/b/a Visiting Physicians Association, Dr. Mahar alleges that he "was shocked to discover that the Flint front

office staff had been removing patient documentation from the patient charts of Dr. Mahar's patients.  These records included notes of his patient encounters and notes of phone calls he had placed to his patients."  (**Ex. 1**, ¶ 35).  Dr. Mahar further alleges that he "believed that VPA had removed the records because Dr. Mahar had always recorded truthful accounts of patient visits and oftentimes these records did not support the eligibility for reimbursement of services and procedures VPA was billing to, *inter alia*, Medicare and Medicaid."  (**Ex. 1**, ¶ 38).

75.     Those allegations are also germane to this litigation, as one of the key problems that was uncovered at Family Nurse Care immediately prior to Defendants' acquisition of Phoenix was the fact that documentation for many patients appeared to be incomplete.  A report prepared by A.D. Maxim & Associates dated July 12, 2007 notes, *inter alia*, the following "Trends/Issues": missing bills to check against missing documents; poorly documented visits/vague charting; 485s incomplete; missing visit notes; no documentation of changes in physician orders; lack of coordination of services; and not following or contradictions to plan of care.

76.     A substantial number of Family Nurse Care patients were treated by physicians employed by USMM and/or VPA, P.C..

77.     The "Trends/Issues" identified in the A.D. Maxim & Associates report are consistent with Dr. Mahar's allegation that USMM staff routinely removed physician records from patient files if those records did not support eligibility for USMM's fraudulent billing scheme.

78.     Immediately after Defendants' acquisition of Phoenix, many Family Nurse Care patients were discharged and then re-opened as "new" patients at Phoenix.  Upon

information and belief, those transferred patients included Medicare and/or Medicaid patients who were receiving "treatment" and testing from USMM and/or VPA, P.C. physicians.

79.    The allegations in the recently unsealed Mahar Qui Tam are consistent with the actions of Mitchell, his agents, and the entity Defendants as set forth in this Complaint and as personally observed in part by Irfan, which Plaintiffs are representative of a pattern of racketeering activity involving numerous instances of mail fraud and wire fraud.

## DEFENDANTS VPA, P.C., USMM, FAMILY NURSE CARE AND MITCHELL'S FRAUDULENT ACTIVITY AS DESCRIBED IN THE PORTER QUI TAM COMPLAINT

80.    The Qui Tam action filed in 2005 by relators Kim Marlowe Porter, James Murray, and Lissette Guy alleges a pattern of fraudulent conduct involving, *inter alia*, Defendants VPA, P.C., USMM, Family Nurse Care and Mitchell.

81.    According to the relators in the Porter Qui Tam, a group of related entities and individuals including Defendants VPA, P.C., USMM, Family Nurse Care and Mitchell "conspired to provide unnecessary physician house calls (once a month) to individuals regardless of whether they meet Medicare's guidelines ("homebound") for house calls certifying as 'homebound' and billing Medicare and Medicaid for individuals they are well aware do not qualify as 'homebound.'"  (**Ex. 2**, *Porter Qui Tam*, ¶ 3).

82.    The Porter Qui Tam relators further allege that those Defendants "conspired to violate the rules against self-referrals by employing physicians on fixed salaries (who have no ownership interest whatsoever in VPA, P.C. or the related Defendants) and directing those physician employees to order all Designated Health

18

Services, i.e., testing, durable medical goods and health related services ("DHS") from the Defendant entities [including USMM, VPA, P.C., and Family Nurse Care] owned/controlled/associated with the individual defendants [including Mitchell].  As a result of this scheme to violate the self-referral regulations, the employee physicians are required in order to continue their employment with VPA, P.C., to order unnecessary tests and services on a daily basis."  (**Ex. 2**, ¶ 4).

83.     According to the Porter Qui Tam relators, "all aspects of the defendant VPA's business operations are arranged so as to charge Medicare/Medicaid for every available billing, irrespective of the medical necessity or even the medical utility of such services and thus the focus of every form, and every weekly meeting of staff and physicians is to increase the number of RVUs[7] billed for visits, tests, CPOs, etc."  (**Ex. 2**, ¶ 75).

84.     The Porter Qui Tam relators' allegations are consistent with Irfan's experience as Administrator of Phoenix, during which he became aware that, based solely on records reviews, a Florida-based VPA physician was prescribing repeated courses of a physical therapy program called "Optimum Balance" to patients, first through Family Nurse Care and then through Phoenix, even though the physical therapists charged with administering the treatments strongly believed they were not medically necessary.

---

7 VPA, P.C.'s shorthand for "home visit resource-based relative value units," a billing system instituted by Medicare in 1998, which assigns monetary values to services based on the perceived time/skill involved. According to the Porter Qui Tam relators, VPA, P.C. required its physician employees to constantly track the RVUs generated by their patient visits and to maximize RVUs without regard to actual patient needs in order to increase VPA, P.C. and the related Defendants' revenues.

85.    The Porter Qui Tam relators further allege that beginning in August 2005, in response to inquiries from Medicare, VPA and the related Defendants "abruptly attempted to cover their tracks" by instructing VPA's physician employees that "contrary to long-standing corporate policy [of billing 90% of visits as comprehensive exams], effective immediately, only twenty-five percent of physicians' visits should be charged to Medicare as comprehensive exams." (**Ex. 2**, ¶ 98).

86.    These alleged attempts to deflect or avoid government scrutiny are consistent with the Defendants' actions in this case, including, *inter alia*, the acquisition of Phoenix for use as a "smoke screen" to deflect government scrutiny away from Family Nurse Care's operations.

87.    The Porter Qui Tam allegations are consistent with and support Plaintiffs' assertions herein that the Defendants in this case have conspired to create and have created a RICO Enterprise separate and distinct from their individual existence, with the purpose of infiltrating a legitimate field of business (the home health care industry) and defrauding various parties through a pattern of racketeering activity that has proximately caused damages to Plaintiffs.

## ACQUISITION OF PHOENIX TO FURTHER FRAUDULENT CONDUCT

88.    Defendant Family Nurse Care d/b/a Pinnacle Senior Care is a home health care agency that provides, *inter alia*, physical therapy, occupational therapy and skilled nursing services to "homebound" patients pursuant to plans of care certified by treating physicians for such patients.

A. **Problems At Family Nurse Care Caused Greater Government Scrutiny**

89.     During early to mid-2007, Defendants became aware of increasing scrutiny of the operations of Family Nurse Care, which was Defendants' primary home care agency in the Brighton, MI area.  Specifically, Family Nurse Care began receiving an increasing number of additional document requests, ("ADR") from the government demanding that Family Nurse Care provide backup for Medicare billings.

90.     In May 2007, home health consultant McBee & Associates, Inc. issued a report to Family Nurse Care noting that, *inter alia*, "only 13% of records reviewed were found to meet all Medicare coverage criteria and billing compliance."  The report further asserted that "a significant portion of the issues uncovered…should have been identified and corrected by operational and clinical management.  Many of these issues should be well known and understood to those with home care experience."

91.     Family Nurse Care's documentation for its patients was frequently inadequate, as is demonstrated by the A.D. Maxim & Associates July 12, 2007 report described above which identifies "Trends/Issues" including, *inter alia*, poorly documented visits and vague charting; incomplete CMS-485 forms; missing visit notes; lack of documentation of changes in physician's orders; coordination of services; failure to follow plans of care, (CMS-485 forms certified by treating physicians); and failure to follow required frequency; etc.

92.     In light of Defendants' ongoing fraudulent activity, such findings were not surprising.  However, in order to deflect the increased governmental scrutiny and head off any stepped-up investigation efforts, Defendants determined that they would acquire

a new home health agency in the area that could be used both to disguise and to further Defendants' fraudulent scheme.

**B.      Defendants Failed To Adequately Disclose Their Plans For Phoenix**

93.      Upon information and belief, Defendants acquired Phoenix as part of a plan to conceal Defendants' numerous failures to comply with applicable Medicare and Medicaid regulations during the course of Defendants' treatment and testing of various Family Nurse Care patients.

94.      Defendants identified Phoenix as a reputable and well-run home health care agency, and determined that they should gain control of Phoenix in order to shift most of the VPA, P.C. controlled patients out of Family Nurse Care and thereby reduce scrutiny of Defendants' operations.

95.      Representatives from USMM contacted Plaintiffs and told them that they would be interested in buying Phoenix because they knew it was a good business.

96.      Mitchell met with Irfan in person once before the sale, at which time Mitchell spoke with Irfan about his home health care delivery system.  However, the majority of communications between Plaintiffs and Defendants' representatives occurred via telephone, fax or electronic mail.

97.      At no time prior to their acquisition of Phoenix did Defendants disclose their illegal practices such as, *inter alia*, their requirement that VPA, P.C. physicians maximize revenue from home diagnostic testing and home health care services without regard for the actual requirements of their patients, or their practice of improperly re-certifying patients for unnecessary and repetitive care.  Defendants likewise did not disclose to Plaintiffs that they intended to apply similar methods to the operation of

Phoenix, and that they intended to control the care of certain Phoenix patients in the same fashion.

98.     Defendants similarly failed to disclose that they intended to immediately shift VPA, P.C. controlled patients who lacked proper and accurate records of care to Phoenix in order to deflect scrutiny away from Family Nurse Care and, in some cases, to repeat courses of physical therapy that had already been provided to those patients and that should not be eligible for further reimbursement from Medicare.

99.     Defendants likewise failed to disclose the findings of the both McBee & Associates and A.D. Maxim & Associates, consultants who had recently reviewed Defendants' operations at Family Nurse Care, and failed to disclose the increasing governmental scrutiny of Family Nurse Care's operations.

100.    When Plaintiffs directly inquired as to whether there was any regulatory scrutiny they should know about, Defendants' representatives responded that several of Mitchell's entities were "at any given time" subject to "routine governmental review," and represented that such entities were "unrelated" to the acquisition of Phoenix.  This was a material misrepresentation, as Defendants were well aware that the entire purpose of the Phoenix acquisition was to deflect specific and increasing governmental scrutiny away from Family Nurse Care by, *inter alia*, shifting patients to Phoenix that did not have adequate documentation to support the care that was being provided to them and billed to state and federal governments.

101.    Instead of revealing any of their actual business practices to Plaintiffs, Defendants instead represented to Plaintiffs that they intended to use Phoenix as a model for their other home health care agencies.

23

102.    Defendants also represented that they wished to employ Irfan as the Administrator of Phoenix, when in fact Defendants intended only to use Irfan as a figurehead to make it appear as though Phoenix's operations had not changed.

103.    Defendants' material misrepresentations and their failure to disclose their questionable and illegal business practices, the purpose for their proposed acquisition of Phoenix, and their substantial regulatory violations at Family Nurse Care to Plaintiffs were material omissions that have resulted in damage to Plaintiffs.

104.    If Plaintiffs had been aware of the level of governmental scrutiny that existed at Family Nurse Care, Plaintiffs would not have agreed to provide seller financing for the Phoenix acquisition.

105.    Had Plaintiffs been aware of Defendants' illegal business practices and the actual purpose of Defendants' acquisition of Phoenix, Amna would not have agreed to sell Phoenix to Defendants on any terms, and Irfan would not have agreed to accept employment with any entity owned or affiliated with Defendants.

106.    Defendants fraudulently induced Irfan to enter into an agreement to act as the Administrator of Phoenix by representing to Irfan that he would be able to operate Phoenix in substantially the same fashion as he had done prior to the acquisition.

107.    At all times, however, Defendants intended to expand their improper and illegal conduct to include Phoenix and certain of its patients, and Defendants never intended to allow Irfan to exercise any meaningful control over Phoenix.  Rather, Defendants intended to use Irfan's continued presence as a means of maintaining Phoenix's reputation as an upstanding and well-run home health care agency.

108.   Further, upon information and belief, Defendants intended to use Irfan's presence as a means of obtaining outside referrals to Phoenix which Defendants could then integrate into the USMM/VPA, P.C. system.

**C.   Irfan's Concerns Quickly Led To His Removal As "Administrator"**

109.   After the closing, Irfan quickly became concerned about Defendants' practices and raised concerns that they were improper and potentially illegal.

110.   For example, soon after Defendants' acquisition of Phoenix, several physical therapists that had been moved to Phoenix from Family Nurse Care informed Irfan that a number of "new" Phoenix patients had actually just been discharged from Family Nurse Care and, moreover, that the "Optimum Balance" physical therapy regimen that was prescribed for such patients had already been carried out multiple times – in some cases as many as three or four – through Family Nurse Care, without any improvement for the relevant patients.

111.   The physical therapists were strongly opposed to additional "Optimum Balance" therapy as they did not believe it was medically necessary or appropriate.

112.   When Irfan raised such concerns to Mitchell and his agent Robert Sowislo around the beginning of October 2007, Mitchell and Sowislo informed Irfan that they would take "immediate action" to address Irfan's concerns.   However, very shortly thereafter, Mitchell and Sowislo began to restrict Irfan's employment duties and his access to information.

113.   Around that same time, Mitchell and Sowislo indicated to Irfan that they wished to send VPA, P.C. physicians to the homes of Phoenix patients to perform diagnostic testing.   Irfan strongly disagreed, noting that as a non-physician himself, he

25

could not authorize diagnostic testing of Phoenix patients.   Mitchell and Sowislo expressed the opinion that the Phoenix patients "belonged" to them, since Defendants had purchased Phoenix.

114.   Shortly after those meetings, Defendants acted to further limit Irfan's ability to perform his duties as Administrator of Phoenix, including locking him out of his office and preventing him from accessing other locations at Phoenix that were germane to his duties as Administrator.  By November 22, 2007, Mitchell and Sowislo informed Irfan that he was no longer to act as Adminstrator and that his duties were to be severely limited.

115.   For the next nine months, Mitchell and Sowislo's treatment of Irfan deteriorated and his job duties were systematically stripped away.  Eventually, by early fall of 2008, Sowislo instructed Irfan to stay away from Phoenix's offices altogether.

116.   With the knowledge that Irfan had become increasingly vocal about Defendants' failure to comply with health care regulatory directives in connection with the operations at Phoenix, Defendants retaliated against Plaintiffs and ceased all payments to Plaintiffs even though significant amounts remained due and outstanding for the sale of Phoenix.

117.   In addition, Defendants ceased making payments due to Irfan under his contract to act as Administrator for Phoenix, though a balance of nearly two years remained under the terms of that contract.   Moreover, Defendants' constructive discharge of Irfan caused Phoenix to be faced with the continued failure of Defendants to comply with health care regulatory directives, and resulted in obvious

26

mismanagement that could ultimately lead to an audit review similar to what had occurred at Family Nurse Care.

## DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY

118.   In association with their fraudulent scheme to obtain undeserved monies from the United States and to acquire Phoenix as a means by which to conceal and further their fraudulent scheme, Defendants, through the RICO Enterprise, engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1) through the perpetration of several thousands of instances of mail fraud and wire fraud within the last 10 years, in violation of 18 U.S.C. §§ 1341 and 1343.

119.   Defendants caused to be transmitted, on a nearly daily basis, through the United States mails and/or United States wires, thousands of separate documents containing false and fraudulent claims for reimbursements from federal and state health care programs to which they were not lawfully entitled.

120.   The documents contained false information in that the payments requested thereon were either for unnecessary testing and/or services which were not required or medically appropriate; for repetitive provision of services such as the "Optimum Balance" program for which Medicaid and Medicare do not provide maintenance care; and/or were designed to maximize Defendants' profit rather than to provide appropriate care for the relevant Medicaid and Medicare enrollees.

121.   It is further believed that at times, agents acting on behalf of Defendants or the RICO Enterprise also communicated such false information over the telephone wires via electronic mail or through internet billing procedures.

27

122.   The transmission of these documents and the making of these communications through interstate wires was for the purpose of, among other things, maximizing the revenue stream for the collective entity Defendants, and, thus, the communications were made in connection with and for the purpose of executing a larger scheme or artifice to defraud state and federal governments and misrepresent to and/or conceal the lack of any medical necessity for a large portion of Defendants' billings.

123.   Said documents and communications contained misrepresentations and/or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension.

124.   In addition, in order to perpetuate their fraudulent scheme, Defendants transmitted correspondence and communications to Plaintiffs through the U.S. Mail and through the telephone wires via electronic mail that contained fraudulent misrepresentations and omitted certain material information such that persons of ordinary prudence and comprehension would have been deceived.

125.   Because Defendants illegally sought to gain control of Phoenix in violation of 18 U.S.C. § 1962(a), defrauding Plaintiffs in the process, Defendants' ongoing pattern of racketeering activity proximately caused Plaintiffs to suffer significant damages.

## COUNT I - VIOLATION OF RICO, 18 U.S.C. § 1962(B), (C), & (D)

### As to all Defendants

126.    Plaintiffs reallege all allegations as set forth herein.

### RICO Persons

127.    The culpable RICO "persons" are Defendants Mark Mitchell, U.S. Medical Management, LLC, VPA, P.C., Family Nurse Care, LLC, and Phoenix Home Health Care, LLC.

128.    The above referenced individuals and entities all are "persons" capable of holding a legal or beneficial interest in property, within the meaning of 18 U.S.C. 1961 (3) and 1962 (a), (b), (c), and (d).

### RICO Enterprise

129.    Plaintiffs herein allege a separate and distinct "enterprise" within the meaning of 18 U.S.C. 1961(4) and 1962 (a), (b), (c), and (d), which constitutes an "enterprise," an "association in fact," or a "de facto association," within the meaning of 18 U.S.C. 1961(4).  Specifically, Plaintiffs allege that the RICO Enterprise consists of a conspiratorial association including Defendants Mark Mitchell, U.S. Medical Management, LLC, VPA, P.C., Family Nurse Care, LLC, Phoenix Home Health Care, LLC, and non-party Home Health Ventures, LLC.

130.    The named defendants in this cause of action are and/or were employed by, or associated with, the RICO Enterprise.

131.    The aforementioned RICO Enterprise exists independently of the above named "persons" named herein.

132.    The aforementioned RICO Enterprise exists independently of the pattern of unlawful racketeering activity described herein.

### Interstate or Foreign Commerce

133.    The aforementioned RICO Enterprise named herein was engaged in activities that affected interstate or foreign commerce within the meaning of 18 U.S.C. 1962 (a), (b), (c), and (d).

### Pattern of Racketeering

134.    Defendants directly and indirectly conducted and participated in the conduct of the RICO Enterprise's affairs through the pattern of racketeering activity described herein in violation of 18 U.S.C. 1962 (a), (b), (c), and (d).

### Racketeering Activity / Predicate Acts

135.    Pursuant to and in furtherance of their fraudulent scheme and artifice, Defendants intentionally and/or with actual knowledge, committed multiple related predicate acts, as defined by 18 U.S.C. 1961(1)(B) and (5), including:

    a.    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

    b.    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

136.    More specifically, the Defendants, through the RICO Enterprise, knowingly, willfully, and intentionally communicated through wires and mails false information to state and federal governments in a manner consistent with the RICO Enterprise and for the purpose of furthering the RICO Enterprise's fraudulent scheme.

137.    The RICO Enterprise described herein transmitted to state and local governments by mail, fax, email, or other electronic means documents consisting of

bills, invoices, requests for reimbursement, and other forms of documents containing false information relating to the necessity of care provided to Medicaid and Medicare enrollees; the "homebound" status of Medicaid and Medicare enrollees;  representing that certain services were provided when they were not; concealing or failing to disclose that certain services had already been provided to certain Medicaid and Medicare enrollees without effect; representing that the purpose of the charges was a lawful and appropriate provision of service, when the true purpose was to obtain profits from state and local governments through illicit means; and various other matters relating to the schemes described herein.

138.    Said documents were transmitted as described above on a regular basis, and are believed to number in the thousands for the relevant period of limitations, as the entity Defendants provided services to Medicaid and Medicare enrollees on a daily basis, many of which were unnecessary or inappropriate.

139.    In addition, it is believed that Defendants, and/or their agents, conveyed and communicated false information relating to their scheme through the use of cellular and land-line telephones, constituting further wire frauds.

140.    As a means of furthering their fraudulent scheme, Mitchell and representatives of certain entity Defendants communicated false and misleading information to Plaintiffs by mail, fax, email, or through the use of cellular and land-line telephones in order to induce Plaintiffs to surrender control of Phoenix to Defendants, who promptly integrated Phoenix into the Enterprise.

*Injury and Damages*

141.   Plaintiffs are "persons" capable of holding a legal or beneficial interest in property, within the meaning of 18 U.S.C. 1961(3) and 1964(c).

142.   Defendants' wrongful racketeering activities and violations of 18 U.S.C. 1962 (b), (c), and (d) directly and proximately caused significant financial and economic damages to the business and property of Plaintiffs.

143.   Defendants' attempts to gain control of Phoenix were themselves illegal under 18 U.S.C. § 1962(a).

144.   Defendants' actions in shutting Irfan out of Phoenix and cutting off payments to Irfan and Amna arose directly out of Irfan's refusal to participate in or assist with Defendants' fraudulent scheme, and Irfan's concerns after he began to uncover Defendants' fraud in their inducement of the sale of Phoenix.

145.   Accordingly, Plaintiffs are entitled to an award of actual damages, in addition to treble damages and attorney fees under 18 U.S.C. 1964(c).

## COUNT II – FRAUD AND CONSTRUCTIVE FRAUD

### *As to Defendants Mitchell and USMM*

146.   Plaintiffs reallege all allegations as set forth herein.

147.   The Defendants, through their agents and/or on their own behalf, made various statements and representations to Plaintiffs that were false.

148.   Among other things, Defendants represented to Plaintiffs:  (A) that they intended to use Phoenix as a "model" for Defendants' other home health care agencies; (B) that Defendants would ensure that Plaintiffs received the full purchase price for Phoenix even though the Phoenix shares were actually being acquired by Home Health

32

Ventures, a shell with no separate assets of its own; (C) that the operations of Phoenix would not significantly change since Irfan would remain in his position as Administrator; and (D) that Phoenix would continue to employ Irfan in his position as Administrator for at least three years.

149.    Defendants made such representations in the context of a business transaction knowing that they were false, or recklessly without regard for their truth or falsity.

150.    Defendants knew that Plaintiffs were likely to rely on such representations, and in fact intended for Plaintiffs to so rely.

151.    Plaintiffs did rely on Defendants' representations, and as a result, Plaintiffs have sustained damages.

152.    Even if Defendants did not intend to defraud Plaintiffs, Defendants' representations and actions necessarily perpetrated a fraud upon Plaintiffs.

### COUNT III – NONDISCLOSURE OR "SILENT" FRAUD

#### *As to Defendants Mitchell and USMM*

153.    Plaintiffs reallege all allegations as set forth herein.

154.    Moreover, during the negotiations prior to Defendants' acquisition of Phoenix, Defendants concealed and/or failed to disclose material facts to Plaintiffs relating to Defendants' operations of their home health care agencies and their plans for the future operation of Phoenix.

155.    Specifically, and among other things, Defendants failed to disclose:  (A) that their existing home health care agency in the area, Family Nurse Care, was seriously mismanaged and under scrutiny by state and federal governments; (B) that

33

Defendants' home health care agencies were involved in a pattern of racketeering activity as described herein; (C) that Defendants intended to involve Phoenix in a RICO enterprise designed to fraudulently obtain monies from state and federal governments; and, (D) that Defendants did not intend to permit Irfan to exercise appropriate control over Phoenix as required for him to perform his duties as Phoenix's Administrator.

156. Such information was not within the fair and reasonable reach of Plaintiffs, and Plaintiffs could not discover such information by exercise of reasonable diligence or any means of knowledge open to both Plaintiffs and Defendants.

157. Under the circumstances of the transaction, Defendants had an equitable duty to disclose to Plaintiffs their business practices and resulting governmental scrutiny, as well as their intention to transfer numerous VPA, P.C.-controlled patients to Phoenix for unnecessary and improper diagnostic testing and treatment.

158. If Plaintiffs had been aware of the nature and extent of government scrutiny as to Defendants' existing operations through Family Nurse Care, Plaintiffs would not have agreed to provide seller financing for Defendants' acquisition of Phoenix.

159. If Plaintiffs had been aware of the circumstances driving Defendants' attempts to acquire Phoenix (specifically, that Defendants intended to use Phoenix to conceal and further an overarching fraudulent scheme and pattern of racketeering activity), Plaintiffs would not have agreed to sell Phoenix to Defendants on any terms.

160. As a direct and proximate result of Defendants' omissions and/or concealment of material facts which Defendants had an equitable duty to disclose, Plaintiffs have sustained substantial damages.

34

## COUNT IV – "INNOCENT" MISREPRESENTATION

### *As to Defendants Mitchell and USMM*

161.    Plaintiffs reallege all allegations as set forth herein.

162.    Defendants made material misrepresentations to Plaintiffs regarding, *inter alia*, their intent to use Phoenix as a "model" for Defendants' other home health care agencies; their intent to allow Irfan to continue managing Phoenix in the same manner as before the change in ownership; and the scope and import of the governmental scrutiny at Family Nurse Care.

163.    Further, Defendants failed to inform Plaintiffs and actively concealed from Plaintiffs the existence of Defendants' longstanding racketeering activities, their intent to use Phoenix to conceal and further such racketeering activities, and the substantial problems that existed at Family Nurse Care as described in the McBee & Associates and A.D. Maxim & Associates reports.

164.    Plaintiffs were deceived by Defendants' material misrepresentations and failures to disclose material information, and were led to believe that Defendants were involved only in entirely legitimate business and, moreover, that Defendants would operate Phoenix through Irfan in a manner consistent with Phoenix's operations prior to the transfer of ownership.

165.    Plaintiffs justifiably relied, when they entered into a contract for the sale of all of their ownership interest in Phoenix; agreed to provide seller financing for the sale of Phoenix; and agreed that Irfan would enter into an employment contract with Phoenix, on Defendants' material misrepresentations and failures to disclose material information.

35

166.    As a result of Defendants' material misrepresentations and failures to disclose material information, Plaintiffs have been significantly damaged in their business and property, and their losses inured to the benefit of Defendants.

## COUNT V – CONSPIRACY

### *As to All Defendants*

167.    Plaintiffs reallege all allegations as set forth herein.

168.    Defendants U.S. Medical Management, LLC, VPA, P.C., Family Nurse Care, LLC, and Phoenix Home Health Care, LLC have conspired with one another, and with Mitchell (in his individual capacity and in his capacity as agent of various of the aforementioned entities) in order to carry out the unlawful actions and conduct described herein.

169.    These actions and conduct were accomplished by unlawful means.

170.    Plaintiffs have sustained damages as a result of Defendants' unlawful actions and conduct.

171.    Defendants' conduct is and has been at all times willful, wanton and malicious, and Plaintiffs are therefore entitled to exemplary damages.

## COUNT VI – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

### *As to Defendants Mitchell and USMM*

172.    Plaintiffs reallege all allegations as set forth herein.

173.    Amna and Home Health Ventures are parties to a Purchase Agreement requiring Home Health Ventures to pay to Amna the total sum of $2,110,000.00 in exchange for Amna's ownership interest in Phoenix.

36

174.   Home Health Ventures has breached the Purchase Agreement by refusing to pay to Amna the full amount of the agreed-upon purchase price for Phoenix.

175.   Home Health Ventures' breach of the Purchase Agreement was instigated by Defendants Mitchell and USMM, and such instigation was unjustified.

176.   Further, Irfan and Phoenix are parties to an Employment Agreement requiring Phoenix to employ Irfan at a salary of $150,000, plus benefits and bonuses.

177.   Phoenix has breached the Employment Agreement by failing to employ Irfan as described therein; constructively discharging Irfan in violation of the specific terms of the Employment Agreement; and failing to pay to Irfan certain salary and benefits to which he is entitled.

178.   Phoenix's breach of the Employment Agreement was instigated by Defendants Mitchell and USMM, and such instigation was unjustified.

179.   Defendants' instigation of the breaches described above arose out of a per se wrongful act: Defendants' retaliation against Plaintiffs for their intransigence when faced with Defendants' attempts to conduct illegal and fraudulent racketeering activity through Phoenix, as described herein.

180.   Defendants' actions in instigating the breaches of the Purchase Agreement and Employment Agreement were malicious, unjustified in law, were intended to invade the contractual rights of Plaintiffs, and were intended as retaliation against Plaintiffs.

181.   As a direct and proximate result of Defendants Mitchell and USMM's tortuous interference with the Purchase Agreement and Employment Agreement, Plaintiffs have suffered damages well in excess of $250,000.

182.   Defendants' conduct is and has been at all times willful, wanton and malicious, and Plaintiffs are therefore entitled to exemplary damages.

## COUNT VII – TORTIOUS INTERFERENCE
## WITH A VALID BUSINESS EXPECTANCY

### *As to Defendants Mitchell and USMM*

183.   Plaintiffs reallege all preceding allegations herein.

184.   Plaintiff Irfan Mahmood had a valid business expectancy, based on representations of Mitchell and agents of Defendant USMM, that he would remain employed by Phoenix in the position of Administrator for a period of three years.

185.   Among other things, Irfan was told that Defendants were in need of his specific skill set; that Defendants wanted to use the home health agency he had administered for years as a "model" for their other home health agencies; and that Defendants did not intend to make any substantial changes to his operation of Phoenix.

186.   Defendants Mitchell and USMM were well aware of Irfan's business expectancy, as those Defendants endeavored to create such expectancy in order to acquire control of Phoenix.

187.   After Defendants Mitchell and USMM realized that Irfan would not participate in, or knowingly allow them to conduct, racketeering activity through Phoenix, those Defendants intentionally interfered with Irfan's relationship with Phoenix by, *inter alia*, systematically stripping Irfan of his duties, rendering it impossible for Irfan to perform the duties that remained to him, and causing Irfan's constructive discharge.

188.   Defendants' interference with Irfan's relationship and valid business expectancy with Phoenix arose out of a per se wrongful act: Defendants' retaliation

38

against Irfan for his intransigence when faced with Defendants' attempts to conduct illegal and fraudulent racketeering activity through Phoenix, as described herein.

189.    Defendants' interference with Irfan's relationship and valid business expectancy with Phoenix was malicious, unjustified in law, was intended to invade and destroy Irfan's valid business expectancy and relationship with Phoenix, and was intended as retaliation against Irfan.

190.    As a direct and proximate result of Defendants Mitchell and USMM's tortuous interference with Irfan's valid business expectancy and relationship with Phoenix, Irfan has suffered damages.

191.    Defendants' conduct is and has been at all times willful, wanton and malicious, and Plaintiffs are therefore entitled to exemplary damages.

## COUNT VIII – UNJUST ENRICHMENT

### *As to Defendants Mitchell and USMM*

192.    Plaintiffs reallege all allegations herein.

193.    As a result of the illegal and fraudulent activities described herein, Defendants have received substantial benefits at the expense of Plaintiffs, including, *inter alia*, the difference between the value of Phoenix at the time of its sale and the funds actually remitted to Plaintiffs.

194.    All or the majority of such benefits were obtained outside of any valid or binding contracts between Defendants and Plaintiffs.

195.    Retention of such benefits by Defendants would be inappropriate, unfair and inequitable to Plaintiffs, particularly since such benefits were obtained through illegal and/or fraudulent means.

39

196.    Defendants have been unjustly enriched at the expense of Plaintiffs.

**WHEREFORE** Plaintiffs respectfully request that this Honorable Court award

them the following relief:

a.    A joint and several money judgment against Defendants consisting of actual damages, consequential damages, incidental damages, pre-filing and post-filing interest, costs, and treble damages and attorney fees pursuant to 18 U.S.C. § 1964(c); and

b.    All other appropriate legal and equitable relief, including any necessary injunctions or other orders.

Respectfully Submitted,

**MANTESE HONIGMAN ROSSMAN
AND WILLIAMSON, P.C.**
Attorneys for Plaintiffs

By:    s/Ian M. Williamson
Gerard Mantese (P34424)
gmantese@manteselaw.com
Ian M. Williamson (P65056)
iwilliamson@manteselaw.com
1361 E. Big Beaver Road
Troy, MI 48083
(248) 457-9200

Dated:  November 19, 2009

## JURY DEMAND

Plaintiffs hereby request trial by jury.

Respectfully Submitted,

**MANTESE HONIGMAN ROSSMAN
AND WILLIAMSON, P.C.**
Attorneys for Plaintiffs

By:     s/Ian M. Williamson
        Gerard Mantese (P34424)
        gmantese@manteselaw.com
        Ian M. Williamson (P65056)
        iwilliamson@manteselaw.com
        1361 E. Big Beaver Road
        Troy, MI 48083
        (248) 457-9200

Date:  November 19, 2009